IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs June 22, 2011

# TIMOTHY ROBERSON v. STATE OF TENNESSEE

**Direct Appeal from the Criminal Court for Davidson County**
**No. 4254    Cheryl Blackburn, Judge**

---

**No. M2011-00130-CCA-R3-HC - Filed October 19, 2011**

---

In 1995, a Gibson County jury convicted the Petitioner, Timothy Roberson, of first degree felony murder and especially aggravated robbery, and the trial court sentenced him to an effective sentence of life imprisonment plus fifteen years.  The Petitioner filed a petition for habeas corpus relief, his second such petition, alleging that his conviction is void.  The habeas corpus court summarily dismissed the petition for failure to state a cognizable claim, and the Petitioner filed a timely notice of appeal.  On appeal, he contends: (1) the jury found him guilty of felony murder without first determining whether he had the intent to commit the predicate felony of robbery; (2) the indictment for felony murder failed to allege facts that constitute an offense; (3) the trial court lacked jurisdiction to convict because both convictions were based on one criminal episode, violating double jeopardy; (4) the trial court failed to instruct the jury on the lesser-included offenses of reckless homicide and criminally negligent homicide; and (5) during sentencing, the trial court improperly instructed the jury that torture is an aggravating factor.  Upon a review of the record in this case, we are persuaded that the habeas corpus court properly dismissed the petition for habeas corpus relief.  Accordingly, the judgment of the habeas corpus court is affirmed.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

ROBERT W. WEDEMEYER, J., delivered the opinion of the court, in which JOSEPH M. TIPTON, P.J., and CAMILLE R. MCMULLEN, J., joined.

Timothy Roberson, Pro Se, Nashville, Tennessee.

Robert E. Cooper, Jr., Attorney General and Reporter; Sophia S. Lee, Assistant Attorney General; Victor S. Johnson, III, District Attorney General; Bret Gunn, Assistant District Attorney General, for the Appellee, State of Tennessee.

**OPINION**

## I. Facts

In 1995, a jury convicted the Petitioner of first degree felony murder and especially aggravated robbery. In 1997, the Petitioner challenged his convictions on direct appeal, and we affirmed the convictions. *State v. Timothy Roberson*, No. 02C01-9508-CC-00245, 1997 WL 736513, at *1-5 (Tenn. Crim. App., at Nashville, Dec. 1, 1997), *perm. app. denied*, (Tenn. June 29, 1998).

This Court summarized the underlying facts on direct appeal as follows:

Clyde Smith, the father of the victim, Robert Smith, testified that he saw his son at approximately 9:30 p.m. on November 26, 1993. He said that on November 28, his mother called and told him that she had not seen the victim over the Thanksgiving weekend and that he always came by on Saturday. Mr. Smith stated that he and his other son, Charles Smith, went to the victim's apartment. He testified that he discovered the door to the apartment open and the lights out. According to Mr. Smith, Charles entered the apartment and called the victim's name, and when the victim did not respond, they left the apartment, believing that the victim had stepped outside. He said that they returned at about 6:30 p.m. and discovered the victim dead, lying on his back in a pool of blood in the kitchen. He testified that the apartment had been ransacked. Mr. Smith stated that he later found several items missing from the victim's apartment, including a VCR. He also said that he told Sergeant Morris that the victim generally carried a large sum of cash with him. According to Mr. Smith, the victim had some learning disabilities, although he was not classified as being mentally retarded and was able to function in society.

Dr. Jerry Francisco, a pathologist, testified that he along with Dr. Violet Hnilica conducted an autopsy of the victim. He stated that the examination of the victim showed that the cause of death was multiple injuries to the body. He said that the victim suffered blunt-force injuries to the head, cuts to the neck and a group of stab wounds to the chest. In Dr. Francisco's opinion, any of the types of injuries could have caused the victim's death. He testified that the injuries caused damage to the brain, the voice box, the lungs and the heart. He stated that there were thirteen stab wounds to the chest that were deep, penetrating the victim's heart, lungs and ribs. He said that two of the cuts to the victim's neck severed the jugular vein. Dr. Francisco described the

2

victim's blunt-force injuries to the head as a [broken skull](#) extending to the base of the skull. On cross-examination, Dr. Francisco testified that it was possible that death or unconsciousness could have occurred after the first few injuries were inflicted. He also conceded that if the victim was unconscious after the first few injuries were inflicted, he would not have felt any pain. Dr. Francisco admitted that there was no way for him to determine how quickly the victim died, but he said that it would have taken at least minutes.

Sergeant Jerry Morris of the Milan Police Department testified that he responded to a call regarding the victim. He said that he discovered the victim lying on his back and partially on his right side in the kitchen surrounded by blood on the floor, wall and refrigerator. He stated that the victim was wearing a T-shirt and jeans and did not have shoes or socks on. Sergeant Morris testified that he found a towel with blood on it hanging on a towel rack in the bathroom. He also said that the bedroom had been ransacked in that clothes had been taken out of drawers and thrown at the foot of the bed. Sergeant Morris stated that the television in the living room was on but that the cable had been disconnected.

Sergeant Morris testified that the [Petitioner] was interviewed by the Milan Police Department on three occasions: (1) during the initial investigation, (2) on November 29, 1993, after Sergeant Morris talked to the [Petitioner]'s girlfriend, Clara Langley, and an informant, and (3) on December 5, 1993. He said that he obtained a ring from Ms. Langley and that the informant told him about seeing the [Petitioner] with the VCR and the movies. Sergeant Morris said that during the second and third interviews of the [Petitioner], the [Petitioner] gave a statement. He testified that the [Petitioner] also gave a statement to the Tennessee Bureau of Investigation on November 30, 1993. Sergeant Morris stated that after the [Petitioner]'s second interview, he recovered the victim's ring, approximately nine movies, VCR and a remote control, with the movies and the VCR being found at the [Petitioner]'s home. He said that he verified that the VCR belonged to the victim. He testified that he also recovered the victim's wallet and diamond ring. Sergeant Morris stated that the [Petitioner] took him to where the [Petitioner] disposed of the wallet in a bush approximately fifty feet from Salinger Road. He testified that he recovered the victim's paycheck from a Texaco Station in Milan. He also identified the [Petitioner]'s hiking boots and stated that the [Petitioner] told him that he was wearing the boots during the time of the victim's death.

The [Petitioner]'s statement given to the Milan Police Department on

3

November 29, 1993, reflects that the [Petitioner] claimed that he was at his brother's house and then went to the house of Nikki Wright between the hours of 9:00 p.m. and 2:00 a.m. on November 26, 1993. It also shows that the [Petitioner] told Sergeant Morris that he purchased a ring and VCR from a guy who was driving a 1991 or 1992 Grand Prix about 10:30 or 11:00 p.m. It states that the [Petitioner] told the officers that he paid fifty dollars for the ring and that he traded an air pump for the VCR, although he did not know who owned the items. The statement reflects that the [Petitioner] asserted that he got the airpump from the mother of his girlfriend and that the movies belonged to other people. It also states that the [Petitioner] denied harming the victim and that the [Petitioner] claimed that he had not seen the victim. In the interview, the [Petitioner] explained that his prints could be in the apartment because he visited the victim's home approximately three to four months earlier.

The [Petitioner]'s written statement given to the TBI on November 30, 1993, reflects that the [Petitioner] admitted killing the victim. The [Petitioner] told the officers that he was addicted to crack cocaine and that he had borrowed money from the victim, with whom the [Petitioner] worked, on previous occasions to purchase drugs. He told them that he and the victim were paid on the Wednesday before Thanksgiving and that he spent two hundred dollars on crack cocaine which he smoked on Friday. The [Petitioner] said that he went to the victim's apartment between 11:30 p.m. and midnight because he was out of money and wanted to get some more crack cocaine. The [Petitioner] said that the victim was watching television when he arrived and that he was wearing a T-shirt and pants but no socks or shoes. He said that he asked the victim for twenty-five dollars, but the victim refused, saying that the [Petitioner] owed him twenty-five dollars from one week earlier. The [Petitioner] said that he became mad and that he and the victim argued, pushed and shoved each other near the dining table. He stated that the victim told him to leave and then slapped him on the right side of his face.

The statement also reflects that the [Petitioner] told the officers that he "lost it" when the victim slapped him and that he grabbed a brown kitchen knife and struck the victim in the middle of the chest. The [Petitioner] said that he could not stop and that after the knife broke, he began kicking the victim in the head, shoulders and side while the victim was lying in the kitchen floor. He said that he then picked up a silver knife and stabbed the victim again in the chest, although he could not recall how many times. The [Petitioner] told the officers that the victim was still alive and was trying to remove a box cutter from his left pocket to try to stop him when he took the

4

box cutter from the victim and cut the victim's throat. The [Petitioner] stated that he was so mad that he could not stop and claimed that he did not mean to do it but that he lost his mind. According to the [Petitioner]'s statement, the [Petitioner] went to the bathroom and wiped his hands on a towel at some point.

The [Petitioner]'s statement to the TBI also shows that the [Petitioner] said that he looked throughout the apartment for money or anything to sell, including the [Petitioner]'s bedroom dresser drawers. He also admitted taking the victim's wallet, keys, ring, VCR and movies from the victim's apartment. According to the [Petitioner], the victim's wallet contained one hundred and fifty dollars in cash and a paycheck in the amount of one hundred and fifty-nine dollars. The [Petitioner] told the officers that he went to his cocaine dealer's apartment in Milan immediately after leaving the victim's apartment and purchased crack cocaine. According to the [Petitioner], he took the VCR and movies to his apartment and threw the victim's wallet into a field. The statement reflects that the [Petitioner] conceded cashing the victim's paycheck at a Texaco the next morning and using the money to purchase more crack cocaine.

Sergeant Morris also testified that the [Petitioner] gave a statement on December 5, 1993. The statement reflects that the [Petitioner] denied killing the victim and that he claimed that he had blackout spells and when he awoke, he saw a "figure," although he saw no one. On cross-examination, Sergeant Morris testified that the [Petitioner] was crying and appeared to be remorseful during the statement given to the police department on November 30, 1993. He also stated that his investigation did not reveal anything that would conflict with what the [Petitioner] told him had occurred on the night of the murder.

Mike Cleary, an employee of Texaco, testified that the [Petitioner] came into the store at approximately 5:30 a.m. and asked him to cash the victim's payroll check. He said that he cashed the check, although the [Petitioner] told him that he did not have any identification with him.

Bobby Mosley, owner of the Jewel Box in Milan, identified a lady's diamond ring that he sized for the [Petitioner]. He testified that he had earlier sold the ring to the victim.

Clara Langley testified that she was living with the [Petitioner] at the time the offense occurred and that she worked with both the [Petitioner] and the victim. She identified the lady's diamond ring as the one the [Petitioner] gave to her at 4:00 a.m. on the Saturday morning after the victim's death when

the [Petitioner] asked her to marry him. Ms. Langley said that she asked him where he got the ring and that the [Petitioner] told her that he got it at a jewelry store in Humboldt. She also identified the VCR, remote control and videotapes and stated that the [Petitioner] brought them into their house on either Saturday or Sunday. She said that when she asked the [Petitioner] where he got the VCR, the [Petitioner] told her that he had gotten the items from a man who had a flat tire and he claimed that he traded an air pump for the VCR. On cross-examination, Ms. Langley testified that she suspected that the [Petitioner] was spending a lot of money on drugs around the time of his arrest. She also stated that the [Petitioner] was real nervous on Saturday morning.

Dr. Lynn Zager, a clinical psychologist, testified that she examined the [Petitioner] on November 2, 9, and 16, 1994, to determine the [Petitioner]'s competency to stand trial and his mental condition at the time of the offense. She said that her evaluation showed that the [Petitioner] was an alcoholic and was addicted to cocaine and marijuana. She stated that the [Petitioner] was intoxicated at the time of the offense. In Dr. Zager's opinion, the [Petitioner]'s behavior was partly a result of his intoxication, and the [Petitioner]'s intoxicated state compromised the [Petitioner]'s ability to conform his behavior to the requirements of the law. Dr. Zager testified that the [Petitioner]'s initial denial of guilt was consistent with his [sic] determination that the [Petitioner] suffered from substance abuse. She stated that she found the [Petitioner] to be remorseful about his conduct.

Dr. Zager's psychological evaluation report shows that the [Petitioner]'s father was an alcoholic and that his brother and sister have serious substance abuse problems. It reflects that his parent's divorced at an early age and that the [Petitioner]'s stepfather was verbally abusive to the [Petitioner]. The report states that the [Petitioner], a high school graduate, began drinking and smoking marijuana at age eighteen and began using cocaine in 1991. It shows that the [Petitioner]'s substance abuse became critical in 1992 when he lost his car and his job. The report reflects that the [Petitioner] stopped using drugs and alcohol for a period of time but began abusing alcohol, marijuana and cocaine approximately three weeks before the offense occurred. The results of the report are that although the [Petitioner] has maintained a relatively stable work history, he engages in behaviors that would warrant a diagnosis of a conduct disorder or antisocial personality disorder. It states that the [Petitioner] functions in the low average range of intelligence. The report shows that Dr. Zager's findings were that the [Petitioner] was competent to

6

stand trial and that although the [Petitioner]'s ability to conform his behavior to the requirements of the law was compromised because of his substance abuse, the [Petitioner]'s ability to appreciate the wrongfulness of his behavior was not significantly impaired. In Dr. Zager's opinion, the [Petitioner] was sane at the time of the offense.

Richard Clark, a friend of the [Petitioner], testified that the [Petitioner] came by his house at approximately 1:30 a.m. on November 27, 1993. He said that the [Petitioner] was "high" from smoking crack cocaine, "kind of nervous," and "jittery." Mr. Clark stated that the [Petitioner] had some crack cocaine with him and that the [Petitioner] smoked while he was with him.

*State v. Timothy Roberson*, No. 02C01-9508-CC-00245, 1997 WL 736513, at *1-5 (Tenn. Crim. App., at Nashville, Dec. 1, 1997), *perm. app. denied* (Tenn. June 29, 1998).

After this Court affirmed the Petitioner's convictions on direct appeal, the Petitioner filed a petition for post-conviction relief and, thereafter, a motion to reopen post-conviction. This Court denied both. *Timothy Roberson v. State*, No. W2001-00549-CCA-R3-PC, 2002 WL 1592725, at *1 (Tenn. Crim. App., at Nashville, July 12, 2002); *Timothy Roberson v. State*, W2007-00230-CCA-R3-PC, 2007 WL 3286681, at *1 (Tenn. Crim. App., at Nashville, Nov. 7, 2007), *perm app. denied*, (Tenn. Apr. 14, 2008).

On April 28, 2010, the Petitioner filed his first habeas corpus petition in the Davidson County Criminal Court. That application and the order dismissing it, however, were not provided in the record. The Petitioner did not appeal the dismissal of his first petition to this Court. On June 28, 2010, the Petitioner filed his second application, the current habeas corpus petition, in the Davidson County Criminal Court. In this petition, he challenged the following matters: (1) the validity of the indictment, (2) the jurisdiction of the trial court, and (3) the verdict of the jury. The habeas corpus court summarily dismissed the petition for failure to state a cognizable claim. It is from this judgment that the Petitioner now appeals.

## II. Analysis

On appeal, the Petitioner contends that his convictions are void because: (1) the jury found him guilty of felony murder without first determining whether he had the intent to commit the predicate felony of robbery; (2) the indictment for felony murder failed to allege facts that constitute an offense; (3) the trial court lacked jurisdiction to convict because both convictions were based on one criminal episode, violating double jeopardy; (4) the trial court failed to instruct the jury on the lesser-included offenses of reckless homicide and criminally

negligent homicide; and (5) during sentencing, the trial court improperly instructed the jury that torture is an aggravating factor. The State counters that, because the Petitioner's petition failed to adhere to the procedural requirements under Tennessee Code Annotated section 29-21-107 and failed to raise any cognizable claims for relief, the habeas court properly dismissed the Petition. We agree with the State.

Article I, section 15 of the Tennessee Constitution guarantees the right to seek habeas corpus relief. *See Faulkner v. State*, 226 S.W.3d 358, 361 (Tenn. 2007). Although the right is guaranteed in the Tennessee Constitution, the right is governed by statute. T.C.A. § 29-21-101 (2006) *et seq*. The determination of whether habeas corpus relief should be granted is a question of law and is accordingly given de novo review. *Smith v. Lewis*, 202 S.W.3d 124, 127 (Tenn. 2006); *Hart v. State*, 21 S.W.3d 901, 903 (Tenn. 2000). Although there is no statutory time limitation which applies to bar the filing of a habeas corpus petition, the grounds upon which relief can be granted are very narrow. *Taylor v. State*, 995 S.W.2d 78, 83 (Tenn. 1999). It is the burden of the petitioner to demonstrate by a preponderance of the evidence that "the sentence is void or that the confinement is illegal." *Wyatt v. State*, 24 S.W.3d 319, 322 (Tenn. 2000). In other words, the very narrow grounds upon which a habeas corpus petition can be based are as follows: (1) a claim there was a void judgment which was facially invalid because the convicting court was without jurisdiction or authority to sentence the defendant; or (2) a claim the defendant's sentence has expired. *Stephenson v. Carlton*, 28 S.W.3d 910, 911 (Tenn. 2000); *Archer v. State*, 851 S.W.2d 157, 164 (Tenn. 1993). "An illegal sentence, one whose imposition directly contravenes a statute, is considered void and may be set aside at any time." *May v. Carlton*, 245 S.W.3d 340, 344 (Tenn. 2008) (citing *State v. Burkhart*, 566 S.W.2d 871, 873 (Tenn. 1978)). In contrast, a voidable judgment is "one that is facially valid and requires the introduction of proof beyond the face of the record or judgment to establish its invalidity." *Taylor*, 995 S.W.2d at 83; *see State v. Ritchie*, 20 S.W.3d 624, 633 (Tenn. 2000).

Further, a petition for the writ of habeas corpus must comply with several strict procedural requirements. The petitioner bears the burden of providing the following in a petition for habeas corpus relief:

> (1) That the person in whose behalf the writ is sought, is illegally restrained of liberty, and the person by whom and place where restrained, mentioning the name of such person, if known, and, if unknown, describing the person with as much particularity as practicable;

> (2) The cause or pretense of such restraint according to the best information of the applicant, and if it be by virtue of any legal process, a copy thereof shall be annexed, or a satisfactory reason given for its absence;

8

(3) That the legality of the restraint has not already been adjudged upon a prior proceeding of the same character, to the best of the applicant's knowledge and belief; and

(4) That it is first application for the writ, or, if a previous application has been made, a copy of the petition and proceedings thereon shall be produced, or satisfactory reasons be given for the failure so to do.

T.C.A. § 29-21-107(b) (2006). "[T]he procedural provisions of the habeas corpus statutes are mandatory and must be followed scrupulously." *Archer*, 851 S.W.2d at 165.

In the case under submission, the Petitioner provides the following in his brief as to his first habeas corpus petition: "On April 28, 2010, the appellant filed a petition for Writ of Habeas Corpus alleging that his conviction and sentences are void because of multiple violations of his constitutional rights . . . ." The Petitioner, however, failed to include the first habeas corpus petition with the current petition, brief, or other attachments, violating the strict statutory requirement to produce "a copy of the petition and proceedings thereon . . . or satisfactory reasons . . . given for the failure to do so[,]" regarding the first petition. T.C.A. § 29-21-107(b)(4) (2006). Because we do not have a judgment or an order dismissing the first petition, the content and outcome of the first petition are unclear. We conclude that the Petitioner has failed to scrupulously follow the procedural requirements. This reason alone is sufficient to justify the habeas court's dismissal of the petition.

Notwithstanding the petition's procedural deficiencies, the petition fails to state a cognizable claim for habeas corpus relief. The Petitioner's first contention is that the jury found him guilty of felony murder without determining whether he had the intent to commit the predicate felony of robbery, arguing that, without which, the State cannot support a finding of guilt on felony murder. Essentially, the Petitioner claims that the evidence is not sufficient to support the offense for which the Petitioner was convicted. The State contends that challenges to the sufficiency of the evidence are not cognizable in a habeas proceeding. This Court has repeatedly found that "[t]he law is settled beyond question" that habeas corpus proceedings may not be employed to question the sufficiency of the evidence at a petitioner's original trial. *Gant v. State*, 507 S.W.2d 133, 136 (Tenn. Crim. App. 1973) (citations omitted). Moreover, this Court and our Supreme Court have held that, as a fundamental rule, habeas corpus proceedings "may not be employed to raise and relitigate or review questions decided and disposed of in a direct appeal from a conviction." *Id.* at 137 (citations omitted). This Court reviewed the issue of sufficiency on direct appeal and

9

concluded that there was sufficient evidence to support the Petitioner's convictions. *Roberson*, 1997 WL 736513, at \*5-6 . Therefore, this issue is without merit.

The Petitioner's second contention is that his convictions are void because the indictment failed to allege facts that constitute an offense, specifically those pertaining to the robbery and alleging a date. The Petitioner asserts that the indictment upon which he was convicted is defective because it failed to allege the facts which constitute the offense, depriving the Petitioner of proper notice of the offense for which he was charged. The State contends that the indictment fairly apprised the Petitioner of the charged offenses. If the Petitioner is correct and his indictment is defective, a defective indictment is an appropriate issue to be brought in a habeas corpus petition. *Wyatt v. State*, 24 S.W.3d 319, 324-25 (Tenn. 2000) .

An indictment must meet the statutory requirements of Tennessee Code Annotated section 40-13-102, which provides:

> The indictment must state the facts constituting the offense in ordinary and concise language, without prolixity or repetition, in such a manner as to enable a person of common understanding to know what is intended, and with that degree of certainty, which will enable the court, on conviction, to pronounce the proper judgment; and in no case are such words as "force and arms" or "contrary to the form of the statute" necessary.

T.C.A. § 40-13-202 (Supp. 1982). In the case under submission, the relevant portion of the indictment at issue reads as follows:

> That [the Petitioner] on the ___ day of November, 1993, in Gibson County, Tennessee, and before the finding of this indictment, did unlawfully and recklessly kill Robert Smith during the perpetration of a robbery, in violation of T.C.A. 39-13-202[.]

After a thorough review of the indictment in this case, we find that it is sufficient. The indictment in this case closely follows the statutory form of the crime, and the indictment is consistent with the requirements of Tennessee Code Annotated section 40-13-202 (Supp. 1982). We note that our Supreme Court's decision in *State v. Hill*, 954 S.W.2d 725 (Tenn. 1997) supports this conclusion. In *Hill*, our Supreme Court held that, for constitutional purposes, "an indictment is valid if it provides sufficient information: (1) to enable the accused to know the accusation to which answer is required; (2) to furnish the court adequate basis for the entry of a proper judgment; and (3) to protect the accused from double jeopardy." *Hill*, 954 S.W.2d at 727. In *Hill*, the Court stressed that indictments should be

10

scrutinized from the "enlightened standpoint of common sense and right reason rather than from the narrow standpoint of . . . technicality or hair splitting fault finding." *Id.* at 728 (quoting *United States v. Purvis*, 580 F.2d 853, 857 (5th Cir. 1978)). Since *Hill*, the Court has often repeated its intention to relax "common law pleading requirements and its reluctance to elevate form over substance when evaluating the sufficiency of indictments." *See e.g., State v. Hammonds*, 30 S.W.3d 294, 300 (Tenn. 2000). In *Hammonds*, the Court said, "Indeed, *Hill* and its progeny leave little doubt that indictments which achieve the overriding purpose of notice to the accused will be considered sufficient to satisfy both constitutional and statutory requirements." *Id.*; *see State v. Sledge*, 15 S.W.3d 93, 94 (Tenn. 2000); *Crittenden v. State*, 978 S.W.2d 929, 931 (Tenn. 1998); *Ruff v. State*, 978 S.W.2d 95, 100 (Tenn. 1998). Accordingly, we conclude the indictment provided the Petitioner adequate notice of the charges against him, and the trial court had an adequate basis for the entry of a proper judgment. Therefore, the Petitioner is not entitled to relief as to this issue.

The Petitioner's third assertion is that the trial court lacked jurisdiction to convict because both convictions, felony murder and especially aggravated robbery, were based on one criminal episode, violating double jeopardy. The Petitioner has failed to set forth any evidence indicating that the trial court lacked jurisdiction to convict or sentence him or that a violation of double jeopardy occurred. Even if, however, the Petitioner's claim of double jeopardy had merit, the conviction would be voidable, not void. *Joe Clark Mitchell v. State*, No. M2002-03011-CCA-R3-CO, 2003 WL 22243287 (Tenn. Crim. App., at Nashville, Sept. 30, 2003), sub history; *Ralph Phillip Claypole v. State*, No. M1999-02591-CCA-R3-PC, 2001 WL 523367 (Tenn. Crim. App., at Nashville, May 16, 2001), sub history. A judgment that is voidable may not be collaterally attacked in a suit for habeas corpus relief. *Passarella v. State*, 891 S.W.2d 619, 627 (Tenn. Crim. App. 1994). As a result, Petitioner has failed to state a cognizable claim for habeas corpus relief.

The Petitioner's fourth and fifth contentions challenge the jury instructions given at trial. The Petitioner claims that the trial court erred when it instructed the jury by not providing them with the lesser-included offenses of reckless homicide and criminally negligent homicide and by instructing the jury that torture used during a killing is an aggravating factor. These allegations, however, do not provide cognizable habeas corpus claims. An allegation of an erroneous jury instruction will not sustain an action for habeas corpus relief because such an allegation would, at most, make the judgment voidable and not void. Therefore, habeas corpus relief is not warranted. *See, e.g., Passarella*, 891 S.W.2d at 626 (finding the remedy of habeas corpus in criminal cases is limited to cases where the judgment is void or the term of imprisonment has expired); *see also James Dubose v. State*, M2004-01021-CCA-R3-JC, 2004 WL 2346010, at *1 (Tenn. Crim. App., at Nashville, Oct. 15, 2004), *no perm. app. filed*, (citing *Willie Edward Thornton v. Raney*, No. 02C01-9302-CC-00025, 1994 WL 25827, at *1-2 (Tenn. Crim. App., at Jackson, Jan. 26, 1994) (holding

11

that erroneous jury instructions meet none of the requirements for habeas corpus relief), *perm. app. denied,* (Tenn. May 23, 1994)). These claims, therefore, are without merit.

The Petitioner has not satisfied his burden of showing by a preponderance of the evidence that the convictions are void or that the prison term has expired. *State v. Davenport*, 980 S.W.2d 407, 409 (Tenn. Crim. App. 1998). As such, the Petitioner is not entitled to habeas corpus relief.

### III. Conclusion

In accordance with the aforementioned reasoning and authorities, we affirm the judgment of the habeas corpus court.

_____

ROBERT W. WEDEMEYER, JUDGE